IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

| | |
|---|---|
| ANTONIO LAMAR DUNHAM, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CV 318-018 |
| | ) |
| SAM ZANDERS, Warden; TINA | ) |
| SANDERS, Warden of Care and Treatment; | ) |
| MR. INMAN, Deputy Warden; | ) |
| MR. TREVOR, Correctional Officer; | ) |
| MR. GILBERT, Correctional Officer; | ) |
| DR. ISMAIL; MS. SMITH, Nurse; | ) |
| MS. JACKSON, Nurse; DR. PAUL | ) |
| J. SYRIBEYS; MR. WILKENS, Warden; | ) |
| DR. ALSTON; DR. KITTER; and | ) |
| MS. APRIL, Nurse, individually and in | ) |
| their official capacities, | ) |
| | ) |
| Defendants. | ) |

_____

**O R D E R**
_____

Plaintiff, an inmate at Central State Prison in Macon, Georgia, brought the above-captioned case pursuant to 42 U.S.C. § 1983 regarding events alleged to have occurred in Dodge County, Laurens County, Washington County, and Richmond County, Georgia. Because he is proceeding *in forma pauperis* ("IFP"), Plaintiff's complaint must be screened to protect potential defendants. Phillips v. Mashburn, 746 F.2d 782, 785 (11th Cir. 1984); Al-Amin v. Donald, 165 F. App'x 733, 736 (11th Cir. 2006).

**I.    SCREENING OF THE COMPLAINT**

Plaintiff names as Defendants: (1) Warden Sam Zanders, (2) Warden of Care and

Treatment Tina Sanders, (3) Deputy Warden Inman, (4) Officer Trevor, (5) Officer Gilbert, (6) Dr. Ismail, (7) Nurse Smith, (8) Nurse Jackson, (9) Dr. Paul J. Syribeys, (10) Warden Wilkens, (11) Dr. Alston, (12) Dr. Kitter, and (13) Nurse April. (Doc. no. 1, pp. 1-2.) Taking all of Plaintiff's factual allegations as true, as the Court must for purposes of the present screening, the facts are as follows.

### 1. Assault

On April 25, 2016, while Plaintiff was incarcerated at Dodge State Prison ("DSP"), Plaintiff wrote DSP Warden Zanders about being moved to a different room because his cellmate, Rashad Smith, threatened Plaintiff and "told him he had to go [be]cause he didn't trust [Plaintiff]." (Id. at 11.) Warden Zanders never responded. (Id.) On May 2, 2016, Warden Zanders inspected the dorm, and Plaintiff asked him if he received the letter. (Id.) Warden Zanders told Plaintiff he did not and instructed him to write another. (Id.) Plaintiff did so but received no response. (Id.) Warden Zanders failed to move Plaintiff despite knowing Smith had previously "bitten off a piece" of a former cellmate's ear. (Id. at 23.)

On May 10, 2016, Plaintiff returned to his room from putting his bed sheets in the laundry cart to find Smith had locked the door and would not let in Plaintiff. (Id. at 7.) Plaintiff asked Smith why Smith had not allowed Plaintiff to put on his leg brace and pants. (Id.) Smith "burst[] out of the room howling I'm tired of your shit," and attacked Plaintiff. (Id.) Smith attempted to drag Plaintiff into their room and bit Plaintiff on his hand and head. (Id.)

After Smith stopped attacking, Plaintiff went to the control booth to get medical attention. (Id.) Officers Trevor and Gilbert were not in the control booth, so Plaintiff began beating the windows of the control booth. (Id. at 8.) Officers Trevor and Gilbert, who were serving

2

breakfast in another dorm, came into view through the window. (Id.) Plaintiff showed Officer Trevor he was bleeding from his face and hand. (Id.) Officer Trevor "turned his back on" Plaintiff, and the officers "refused to respond." (Id.)

Plaintiff saw Smith leave their room, so Plaintiff returned to the room to put on his leg brace and pants. (Id.) Smith returned, "grabbed [Plaintiff] in a headlock and stated sense [sic] I know I'm going to lockdown I'm gonna give you something to remember me by forever." (Id.) Smith "put [Plaintiff's right] ear in his mouth and ripped it completely out of [Plaintiff's] head leaving a big hole." (Id.) Plaintiff returned to the control booth and "beat on the window for several minutes" until Officer Gilbert saw him. (Id.) Plaintiff showed Officer Gilbert the injury, and Officer Gilbert called his supervisor to the scene. (Id.) The officers took Plaintiff to medical, where a nurse put Plaintiff's ear in saline and ice so it could be reattached at the hospital. (Id.)

### 2. First Ear Surgery and Post-Operative Care

Officers took Plaintiff to a hospital in Dublin, where Plaintiff received medication. (Id. at 9.) A doctor at the hospital told Plaintiff they would need to transfer him to Dr. Syribeys for surgery and Dr. Syribeys informed the doctor over the phone the ear could not be reattached. (Id.) Officers took Plaintiff to Dr. Syribeys in Macon. (Id.) Plaintiff asked Dr. Syribeys if he was sure there was no way for the ear to be reattached, and Dr. Syribeys told him "there's no way medically possible . . . ." (Id.) Plaintiff "was left with no choice but to let Dr. Syribeys do the surgery." (Id.) After surgery, Dr. Syribeys said no follow-up appointment was necessary and the ear should stop bleeding in four days. Drs. Syribeys and Ismail and DSP Wardens Zanders, Sanders, and Inman decided not to reattach Plaintiff's ear because it was "an easier

3

cheaper but much less effective course of treatment." (Id. at 22.)

Officers returned Plaintiff to Dodge State Prison. (Id. at 9.) Dr. Ismail ordered Nurses Jackson and April to clean the blood from Plaintiff's ear channel with cotton swabs and a mixture of saline and peroxide. (Id.) Beginning on May 16, 2016, Plaintiff complained to Dr. Ismail and Nurses April, Smith, and Jackson about extreme pain, bleeding, headaches, and loud ringing in his right ear, but they told Plaintiff nothing was wrong. (Id. at 10.) On May 19, 2016, Plaintiff was rushed back to the Dublin hospital with extreme pain and swelling in his neck. (Id.) A doctor diagnosed Plaintiff with an infection, prescribed antibiotics, and recommended Plaintiff see a specialist immediately. (Id.)

On May 23, 2016, Plaintiff was still bleeding out of his right ear. (Id.) Dr. Ismail told Nurse April to clean the blood from Plaintiff's infected ear, but she refused, saying she did not want to lose her license for performing the procedure. (Id.) Dr. Ismail had Nurse Smith clean out Plaintiff's ear instead. (Id.) Nurse April told Plaintiff she did not know why Dr. Ismail would not send him to a specialist. (Id.) After Nurse April's statement, Plaintiff began contacting family members to contact prison officials on his behalf. (Id.) "Dodge Medical and Counselor Ms. Fuqua Chief" told Plaintiff's sister Plaintiff would be sent out for treatment soon, but he never was. (Id.)

### 3. Complaints and Grievances

On May 25, 2016, Warden Zanders visited the unit where Plaintiff was located, and Plaintiff informed him of his symptoms and Dr. Ismail's refusal to send Plaintiff for outside medical attention. (Id. at 11.) Plaintiff showed Warden Zanders the bleeding and asked for medical attention. (Id.) Warden Zanders said he would "see what he could do," but Plaintiff did

not hear from Warden Zanders again until he denied Plaintiff's grievance regarding Dr. Ismail two months later. (Id.) By May 28, 2016, Plaintiff was "suffering from mental depression caused by extreme pain and medical neglect." (Id.) Warden of Care and Treatment Sanders came to Plaintiff's cell, and Plaintiff showed her the blood on his pillow and asked why medical was not providing additional treatment. (Id.) Warden Sanders only slammed the cell door window flap in Plaintiff's face. (Id.)

Warden Zanders had a subordinate tamper with Plaintiff's reports regarding the attack and hindered or tampered with Plaintiff's mail, grievance forms, disciplinary forms, and medical files. (Id. at 12, 22.) On June 14, 2016, Plaintiff filed a grievance against disciplinary investigator Ms. Scott for "misleading and abusing disciplinary proc[e]dures by forging and/or adding words to [Planitiff's] disciplinary forms" regarding the attack by Smith. (Id. at 12) Ms. Scott came to Plaintiff's cell after the attack to ask if Plaintiff had anything to tell Warden Zanders about the attack. (Id.) Plaintiff gave a statement to Ms. Scott, who said she would write down what Plaintiff said. (Id.) Ms. Scott gave Plaintiff a blank form to sign and told Plaintiff there would be a disciplinary hearing soon, but none ever occurred. (Id.) Dodge Prison, the Georgia Department of Corrections, administration, security, medical staff attempted to hinder Plaintiff from filing a complaint about the attack. (Id.)

#### 4. **Prison Transfer and Second Ear Surgery**

Between June 16, 2016, and June 22, 2016, Plaintiff was transferred to Washington State Prison ("WSP") "for flooding his cell after being refused medical attention." (Id.) WSP Warden Michael Conley asked Plaintiff about the attack at DSP and told Plaintiff to write him a letter so he could investigate the matter. (Id. at 13.) Warden Conley came back a few weeks later and

told Plaintiff he did not think Plaintiff was being treated fairly and he was going to do everything he could to make sure medical would stop the bleeding in Plaintiff's ear. (Id.) However, WSP counselors Ms. Roberson, Ms. Davis, and Ms. Atkins "hinder[ed] and threaten[ed]" Plaintiff for asking to see grievance responses. (Id.) They also denied Plaintiff's request for mental health assistance. (Id.)

During July 2016, Plaintiff was transferred to Augusta State Medical Prison ("ASMP"). (Id. at 14.) Dr. Bohannon ran tests and recommended surgery to open Plaintiff's ear channel, replace his right ear lobe, stop the infection, and improve hearing. (Id.) Dr. Bohannon informed Plaintiff the bleeding had almost stopped and prescribed medication for headaches and dizziness. (Id.) Dr. Bohannon also recommended the nurses stop cleaning out Plaintiff's ear with the medical swabs and said the nurses "should not have been doing that." (Id.) Dr. Bohnannon asked Plaintiff why Dr. Syribeys did not perform a follow-up evaluation. (Id.)

Dr. Bohannon tried to perform surgery on Plaintiff's ear for almost two years, but ASMP Warden Wilkens and medical administrators Drs. Alston and Kitter rescheduled and delayed surgery on November 29, 2016, May 18, 2017, and September 28, 2017. (Id.) Officials would take Plaintiff's blood and give him a pre-operation physical but they would not perform the surgery. (Id.) During the delay, Plaintiff was treated for at least eight ear infections, dizzy spells, extreme pain, migraine headaches, loud ringing in his head, head injuries from falling, and depression. (Id. at 15.)

After requesting forms for filing a lawsuit about the attack, ASMP officials decided to perform surgery on Plaintiff. (Id.) On October 7, 2017, doctors performed ear reconstruction surgery on Plaintiff's right ear. (Id.) Following the surgery, the doctors told Plaintiff at least two

additional surgeries would be required to "get [Plaintiff's] ear back to satisfactory form." (Id.) However, Plaintiff refused additional surgery because "the doctors messed up [his] arm during the ear surgery." (Id.) The doctors put Plaintiff on antibiotics and pain medication to reduce the swelling and pain in Plaintiff's arm, but he continues to have extreme pain in his arm and left side. (Id.) Plaintiff has complained about the pain, but Central State Prison's medical department is ignoring his requests. (Id.) Plaintiff has written medical administrators at Central State Prison about reviewing his medical file, but they have refused to respond. (Id. at 16.)

Plaintiff seeks declaratory judgement, $100,000 in compensatory damages against each Defendant, $100,000 in punitive damages against each Defendant, and recovery of cost in this suit. (Id. at 26.)

Liberally construing Plaintiff's allegations in his favor and granting him the benefit of all reasonable inferences to be derived from the facts alleged, the Court finds Plaintiff has *arguably* stated viable deliberate indifference to a serious medical need claims arising out of the first ear surgery against Defendants Zanders, Sanders, Inman, Ismail, and Syribeys, deliberate indifference to a serious medical need claims for allegedly delaying the second ear surgery against Defendants Wilkins, Alston, and Kitter, and viable deliberate indifference to safety claims against Defendant Trevor. See Farmer v. Brennan, 511 U.S. 825, 828 (1994) (citations omitted) ("A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."); Jones v. Fogam, No. CV 413-131, 2014 WL 545404, at *3 (S.D. Ga. Feb. 12, 2014), *adopted by* 2014 WL 4805581 (S.D. Ga. Sept. 26, 2014) ("[M]edical decisions based solely on cost containment . . . will not shield prison officials from liability.") (citing Roe v. Elyea, 631 F.3d 843, 861-62 (11th Cir.

7

2011); McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999) ("[A] prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay . . . is relevant in determining what type of delay is constitutionally intolerable."); Murphy v. Turpin, 159 F. App'x 945, 947 (11th Cir. 2005) ("prison officials have a duty to protect prisoners from each other").

In a companion Report and Recommendation, the Court recommends dismissal of Plaintiff's official capacity claims against Defendants Zanders, Sanders, Inman, Trevor, and Wilkens, Plaintiff's deliberate indifference to safety claims against Officer Gilbert and Defendant Zanders, Plaintiff's deliberate indifference to a serious medical need claims for post-surgery treatment against Defendants Zanders, Sanders, Ismail, Syribeys, April, Smith, and Jackson, Plaintiff's First Amendment claims against Defendant Zanders, and Defendants Gilbert, April, Smith, and Jackson from the case.

## II. INSTRUCTIONS

**IT IS HEREBY ORDERED** that service of process shall be effected on Defendants Zanders, Sanders, Inman, Trevor, Wilkens, Ismail, Syribeys, Alston, and Kitter. The United States Marshal shall mail a copy of the complaint, (doc. no. 1), and this Order by first-class mail and request that the defendants waive formal service of the summons. Fed. R. Civ. P. 4(d). Individual defendants have a duty to avoid unnecessary costs of serving the summons, and if a defendant fails to comply with the request for waiver, the defendant must bear the costs of personal service unless good cause can be shown for failure to return the waiver. Fed. R. Civ. P. 4(d)(2). A defendant whose return of the waiver is timely does not have to answer the complaint until sixty days after the date the Marshal mails the request for waiver. Fed. R. Civ. P. 4(d)(3).

However, service must be effected within 90 days of the date of this Order, and the failure to do so may result in the dismissal of any unserved defendant or the entire case. Fed. R. Civ. P. 4(m). Plaintiff is responsible for providing sufficient information for the Marshal to identify and locate the defendant to effect service.

**IT IS FURTHER ORDERED** that Plaintiff shall serve upon the defendants, or upon their defense attorney if appearance has been entered by counsel, a copy of every further pleading or other document submitted to the Court. Plaintiff shall include with the papers to be filed a certificate stating the date a true and correct copy of any document was mailed to the defendants or their counsel. Fed. R. Civ. P. 5; Loc. R. 5.1. Every pleading shall contain a caption setting forth the name of the court, the title of the action, and the file number. Fed. R. Civ. P. 10(a). Any paper received by a District Judge or Magistrate Judge that has not been properly filed with the Clerk of Court or that fails to include a caption or certificate of service will be returned.

It is Plaintiff's duty to cooperate fully in any discovery that may be initiated by the defendants. Upon being given at least five days notice of the scheduled deposition date, Plaintiff shall appear and permit his deposition to be taken and shall answer, under oath and solemn affirmation, any question that seeks information relevant to the subject matter of the pending action. Failing to answer questions at the deposition or giving evasive or incomplete responses to questions will not be tolerated and may subject Plaintiff to severe sanctions, <u>including dismissal of this case</u>. The defendants shall ensure that Plaintiff's deposition and any other depositions in the case are taken <u>within the 140-day discovery period</u> allowed by this Court's Local Rules.

9

While this action is pending, Plaintiff shall immediately inform this Court and opposing counsel of any change of address. Failure to do so will result in dismissal of this case.

Plaintiff must pursue this case; if Plaintiff does not press the case forward, the Court may dismiss it for want of prosecution. Fed. R. Civ. P. 41; Loc. R. 41.1. If Plaintiff wishes to obtain facts and information about the case from the defendants, Plaintiff must initiate discovery. See generally Fed. R. Civ. P. 26 through 37 (containing the rules governing discovery and providing for the basic methods of discovery). Plaintiff should begin discovery promptly and complete it within four months after the filing of the first answer of a defendant named in the complaint screened herein.

Interrogatories are a practical method of discovery for *pro se* litigants. See Fed. R. Civ. P. 33. Interrogatories shall not contain more than twenty-five questions. Id. Plaintiff must have the Court's permission to propound more than one set of interrogatories to a party. Discovery materials should not be filed routinely with the Clerk of the Court; exceptions include when the Court directs filing; when a party needs such materials in connection with a motion or response, and then only to the extent necessary; and when needed for use at trial. If Plaintiff wishes to file a motion to compel pursuant to Fed. R. Civ. P. 37, he should first contact the attorney for the defendants and try to work out the problem; if Plaintiff proceeds with the motion to compel, he should also file a statement certifying that he has contacted opposing counsel in a good faith effort to resolve any dispute about discovery. Loc. R. 26.5.

Plaintiff must maintain a set of records for the case. If papers are lost and new copies are required, these may be obtained from the Clerk of the Court at the standard cost of fifty cents per page.

Under this Court's Local Rules, a party opposing a motion to dismiss shall file and serve his response to the motion within fourteen days of its service. "Failure to respond shall indicate that there is no opposition to a motion." Loc. R. 7.5. Therefore, if Plaintiff fails to respond to a motion to dismiss, the Court will assume that there is no opposition to the defendant's motion and grant the dismissal.

A response to a motion for summary judgment must be filed within twenty-one days after service of the motion. Loc. R. 7.5, 56.1. A failure to respond shall indicate that there is no opposition to the motion. Loc. R. 7.5. Furthermore, each material fact set forth in a defendant's statement of material facts will be deemed admitted unless specifically controverted by an opposition statement. Should a defendant file a motion for summary judgment, Plaintiff is advised that he will have the burden of establishing the existence of a genuine issue as to any material fact in this case. That burden cannot be carried by reliance on the conclusory allegations contained within the complaint. Should a defendant's motion for summary judgment be supported by affidavit, Plaintiff must file counter-affidavits if he desires to contest the defendant's statement of the facts. Should Plaintiff fail to file opposing affidavits setting forth specific facts showing that there is a genuine issue for trial, the consequences are these: any factual assertions made in the defendant's affidavits will be accepted as true and summary

judgment will be entered against Plaintiff pursuant to Fed. R. Civ. P. 56.

SO ORDERED this 15th day of June, 2018, at Augusta, Georgia.

_____
BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA