IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

ANTONIO LAMAR DUNHAM,           )
                                )
          Plaintiff,            )
                                )
     v.                         )          CV 318-018
                                )
SAM ZANDERS, Warden; TINA       )
SANDERS, Warden of Care and Treatment;  )
JOHN INMAN, Deputy Warden;      )
TREVON GILBERT, Correctional Officer;   )
DR. NURALLAH ESMAIL; DR. PAUL J.  )
SYRIBEYS; SCOTT WILKES, Warden;  )
DR. MARY ALSTON; and DR. EDMOND  )
RITTER, individually and in their official  )
capacities,[1]                  )
                                )
          Defendants.           )
_____

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**
_____

Plaintiff, an inmate at Central State Prison in Macon, Georgia, brought this case

pursuant to 42 U.S.C. § 1983, concerning events alleged to have occurred in Dodge County,

Laurens County, Washington County, and Richmond County, Georgia.   Plaintiff is

proceeding *pro se* and *in forma pauperis* ("IFP").  Before the Court is Defendants Zanders,

Sanders, Wilkes, Esmail, Alston, Ritter, and Inman's pre-answer partial motion to dismiss,

---

[1]The Court **DIRECTS** the **CLERK** to update Defendant "Trevor's" name on the docket in accordance with the caption of this Order, which is consistent with Defendants' motion to stay.  (Doc. no. 54.)

(doc. no. 53), and Defendant Syribeys's pre-answer motion to dismiss, (doc. no. 63), (motions together as "Defendants' motions"). For the reasons stated below, Court **REPORTS** and **RECOMMENDS** Defendants Zanders, Sanders, Wilkes, Esmail, Alston, Ritter and Inman's motion to dismiss be **GRANTED IN PART** and **DENIED IN PART**, and Defendant Syribeys's motion to dismiss be **GRANTED**.

## I.     BACKGROUND

### A.     Plaintiff's Complaint

#### 1.     Assault

On April 25, 2016, while Plaintiff was incarcerated at Dodge State Prison ("DSP"), Plaintiff wrote DSP Warden Zanders about being moved to a different room because his cellmate, Rashad Smith, threatened Plaintiff and "told him he had to go [be]cause he didn't trust [Plaintiff]." (Doc. no. 1, p. 11.)  Warden Zanders never responded.  (Id.)  On May 2, 2016, Warden Zanders inspected the dorm, and Plaintiff asked him if he received the letter.  (Id.)  Warden Zanders told Plaintiff he did not and instructed him to write another.  (Id.)  Plaintiff did so but received no response.  (Id.)  Warden Zanders failed to move Plaintiff despite knowing Smith had previously "bitten off a piece" of a former cellmate's ear.  (Id. at 23.)

On May 10, 2016, Plaintiff returned to his room from putting his bed sheets in the laundry cart to find Smith had locked the door and would not let in Plaintiff.  (Id. at 7.)  Plaintiff asked Smith why Smith had not allowed Plaintiff to put on his leg brace and pants.  (Id.)  Smith "burst[] out of the room howling I'm tired of your shit," and attacked Plaintiff.  (Id.)  Smith attempted to drag Plaintiff into their room and bit Plaintiff on his hand and head.  (Id.)

After Smith stopped attacking, Plaintiff went to the control booth to get medical attention.

2

(Id.)   Officers Trevon Gilbert and an unidentified officer were not in the control booth, so Plaintiff began beating the windows of the control booth.  (Id. at 8.)  The officers, who were serving breakfast in another dorm, came into view through the window.  (Id.)  Plaintiff showed Officer Gilbert he was bleeding from his face and hand.  (Id.)  Officer Gilbert "turned his back on" Plaintiff, and the officers "refused to respond."  (Id.)

When Smith left their room, Plaintiff returned to put on his leg brace and pants.  (Id.)  Smith returned, "grabbed [Plaintiff] in a headlock and stated sense [sic] I know I'm going to lockdown I'm gonna give you something to remember me by forever."  (Id.)  Smith "put [Plaintiff's right] ear in his mouth and ripped it completely out of [Plaintiff's] head leaving a big hole."  (Id.)  Plaintiff returned to the control booth and "beat on the window for several minutes" until Officer Gilbert saw him.  (Id.)  Plaintiff showed Officer Gilbert the injury, and Officer Gilbert called his supervisor to the scene.  (Id.)  The officers took Plaintiff to medical, and a nurse placed Plaintiff's ear in saline and ice for reattachment at the hospital.  (Id.)

### 2.      First Ear Surgery and Post-Operative Care

Officers transported Plaintiff to a hospital in Dublin, where he received medication.  (Id. at 9.)  A doctor at the hospital told Plaintiff of the need to transfer him to Dr. Syribeys in Macon for surgery and Dr. Syribeys's opinion, stated in a phone call, that the ear could not be reattached.  (Id.)  Officers took Plaintiff to Dr. Syribeys in Macon.  (Id.)  Plaintiff asked Dr. Syribeys if he was sure there was no way for the ear to be reattached, and Dr. Syribeys told him "there's no way medically possible . . . ."  (Id.)  After the transfer, Plaintiff "was left with no choice but to let Dr. Syribeys do the surgery."  (Id.)  After surgery, Dr. Syribeys said no follow-

3

up appointment was necessary and the ear should stop bleeding in four days.  Drs. Syribeys and Nurallah Esmail and DSP Wardens Zanders, Sanders, and Inman decided not to reattach Plaintiff's ear because it was "an easier cheaper but much less effective course of treatment." (Id. at 22.)

Officers returned Plaintiff to Dodge State Prison.  (Id. at 9.)  Dr. Esmail ordered Nurses Jackson and April to clean the blood from Plaintiff's ear canal with cotton swabs and a mixture of saline and peroxide.  (Id.)  Beginning on May 16, 2016, Plaintiff complained to Dr. Esmail and Nurses April, Smith, and Jackson about extreme pain, bleeding, headaches, and loud ringing in his right ear, but they told Plaintiff nothing was wrong.  (Id. at 10.)  On May 19, 2016, Plaintiff was rushed back to the Dublin hospital with extreme pain and swelling in his neck.  (Id.) A doctor diagnosed Plaintiff with an infection, prescribed antibiotics, and recommended Plaintiff see a specialist immediately.  (Id.)

On May 23, 2016, Plaintiff was still bleeding out of his right ear.  (Id.)  Dr. Esmail told Nurse April to clean the blood from Plaintiff's infected ear, but she refused, saying she did not want to lose her license for performing the procedure.  (Id.)  Nurse Smith cleaned Plaintiff's ear instead.  (Id.)  Nurse April told Plaintiff she did not know why Dr. Esmail would not send him to a specialist.  (Id.)  After Nurse April's statement, Plaintiff began contacting family members to contact prison officials on his behalf.  (Id.)  "Dodge Medical and Counselor Ms. Fuqua Chief" told Plaintiff's sister Plaintiff would be sent out for treatment soon, but he never was.  (Id.)

### 3.    Complaints and Grievances

On May 25, 2016, Warden Zanders visited the unit where Plaintiff was located, and Plaintiff informed him of his symptoms and Dr. Esmail's refusal to send Plaintiff for outside

medical attention.  (Id. at 11.)  Plaintiff showed Warden Zanders the bleeding and asked for medical attention.  (Id.)  Warden Zanders said he would "see what he could do," but Plaintiff did not hear from Warden Zanders again until he denied Plaintiff's grievance regarding Dr. Esmail two months later.  (Id.)  By May 28, 2016, Plaintiff was "suffering from mental depression caused by extreme pain and medical neglect."  (Id.)  Warden of Care and Treatment Sanders came to Plaintiff's cell, and Plaintiff showed her the blood on his pillow and asked why medical was not providing additional treatment.  (Id.)  Warden Sanders only slammed the cell door window flap in Plaintiff's face.  (Id.)

Warden Zanders had a subordinate tamper with Plaintiff's reports regarding the attack and hindered or tampered with Plaintiff's mail, grievance forms, disciplinary forms, and medical files.  (Id. at 12, 22.)  On June 14, 2016, Plaintiff filed a grievance against disciplinary investigator Ms. Scott for "misleading and abusing disciplinary proc[e]dures by forging and/or adding words to [Planitiff's] disciplinary forms" regarding the attack by Smith.  (Id. at 12.)  Ms. Scott came to Plaintiff's cell after the attack to ask if Plaintiff had anything to tell Warden Zanders about the attack.  (Id.)  Plaintiff gave a statement to Ms. Scott, who said she would write down what Plaintiff said.  (Id.)  Ms. Scott gave Plaintiff a blank form to sign and told Plaintiff there would be a disciplinary hearing soon, but none ever occurred.  (Id.)  Dodge Prison, the Georgia Department of Corrections, administration, security, and medical staff attempted to hinder Plaintiff from filing a complaint about the attack.  (Id.)

**4.    Prison Transfer and Second Ear Surgery**

Between June 16, 2016, and June 22, 2016, Plaintiff was transferred to Washington State Prison ("WSP") "for flooding his cell after being refused medical attention."  (Id.)  WSP Warden Michael Conley asked Plaintiff about the attack at DSP and told Plaintiff to write him a letter so he could investigate the matter.  (Id. at 13.)  Warden Conley returned a few weeks later and told Plaintiff he did not think Plaintiff was being treated fairly and he was going to do everything he could to make sure medical would stop the bleeding in Plaintiff's ear.  (Id.)  However, WSP counselors Ms. Roberson, Ms. Davis, and Ms. Atkins "hinder[ed] and threaten[ed]" Plaintiff for asking to see grievance responses.  (Id.)  They also denied Plaintiff's request for mental health assistance.  (Id.)

During July 2016, Plaintiff was transferred to Augusta State Medical Prison ("ASMP"). (Id. at 14.)  Dr. Bohannon ran tests and recommended surgery to open Plaintiff's ear canal, replace his right ear lobe, stop the infection, and improve hearing.  (Id.)  Dr. Bohannon informed Plaintiff the bleeding had almost stopped and prescribed medication for headaches and dizziness. (Id.)  Dr. Bohannon also recommended the nurses stop cleaning out Plaintiff's ear with the medical swabs and said the nurses "should not have been doing that."  (Id.)  Dr. Bohnannon asked Plaintiff why Dr. Syribeys did not perform a follow-up evaluation.  (Id.)

Dr. Bohannon tried to perform surgery on Plaintiff's ear for almost two years, but ASMP Warden Scott Wilkes and medical administrators Drs. Alston and Edmond Ritter rescheduled and delayed surgery on November 29, 2016, May 18, 2017, and September 28, 2017.  (Id.) Officials would take Plaintiff's blood and give him a pre-operation physical but they would not perform the surgery.  (Id.)  During the delay, Plaintiff was treated for at least eight ear infections,

6

dizzy spells, extreme pain, migraine headaches, loud ringing in his head, head injuries from falling, and depression.  (Id. at 15.)

After Plaintiff requested forms for filing a lawsuit about the attack, ASMP officials decided to perform surgery.  (Id.)  On October 7, 2017, doctors performed ear reconstruction surgery on Plaintiff's right ear.  (Id.)  Following the surgery, the doctors told Plaintiff at least two additional surgeries would be required to "get [Plaintiff's] ear back to satisfactory form."  (Id.)  However, Plaintiff refused additional surgery because "the doctors messed up [his] arm during the ear surgery."  (Id.)  The doctors put Plaintiff on antibiotics and pain medication to reduce the swelling and pain in Plaintiff's arm, but he continues to suffer from extreme pain in his arm and left side.  (Id.)  Plaintiff has complained about the pain, but Central State Prison's medical department is ignoring his requests.  (Id.)  Plaintiff has written medical administrators at Central State Prison about reviewing his medical file, but they have refused to respond.  (Id. at 16.)

### B.    Procedural History

On June 15, 2018, the Court allowed the following claims to proceed based on Plaintiff's complaint:

> 1.    deliberate indifference to a serious medical need against Defendants Zanders, Sanders, Inman, Esmail, and Syribeys regarding the May 10, 2016 surgery based on Plaintiff's allegation these Defendants decided not to reattach Plaintiff's ear because it was easier and cheaper, even though it was a less effective course of treatment;

> 2.    deliberate indifference to a serious medical need against Defendants Wilkes, Alston, and Ritter for delaying his second surgery from November 29, 2016, when it was originally scheduled, to October 7, 2017, when the surgery occurred; and

      3.      deliberate indifference to safety against Defendant Trevon Gilbert based on his alleged conduct during the May 10, 2016 attack.

(Doc. no. 13, pp. 7-8.)

On July 11, 2018, the Presiding District Judge dismissed Plaintiff's (1) deliberate indifference to safety claim against Warden Zanders and Officer Gilbert; (2) deliberate indifference to a serious medical need claim for post-surgery care against Zanders, Sanders, Esmail, Syribeys, April, Smith, and Jackson; (3) First Amendment legal mail and interference with the prison grievance procedure claims against Warden Zanders; and (4) official capacity claims for monetary damages against Defendants Zanders, Sanders, Inman, Trevor, and Wilkes.  As a result, the Presiding District Judge dismissed Defendants Gilbert, April, Smith, and Jackson from the case.  (Doc. no. 17.)

On September 13, 2018, the remaining Defendants except Dr. Syribeys filed a pre-answer partial motion to dismiss, arguing Plaintiff failed to exhaust administrative remedies as to his medical claims.  (Doc. no. 53.)  Defendants concede Plaintiff exhausted his deliberate indifference claim against Defendant Gilbert.  (Id.)  On October 19, 2018, Dr. Syribeys also filed a pre-answer motion to dismiss alleging failure to exhaust administrative remedies. (Doc. no. 63.)

**C.**    **Grievance History**

Plaintiff filed twelve grievances from April 25, 2016, through commencement of this case.  (Doc. no. 53-5.)  Five of the twelve are unrelated to Plaintiff's remaining claims in this action.  In grievance 234420, Plaintiff claimed staff misplaced his property when he was transferred to ASMP.  (Doc. no. 53-11, pp. 40-52.)  In grievance 245751, Plaintiff claimed Dr. Cowen at Johnson State Prison intentionally caused him pain and suffering by reducing

the amount of Neurontin he received for back and foot pain.  (Id. at 52, 63-70.)  In grievance 253956, Plaintiff complained of left leg pain and sought reinstatement of his Neurontin prescription.  (Id. at 86-95.)  In grievance 257412, Plaintiff complained about not being permitted to review his medical files.  (Id. at 96-101.)  Finally, in grievance 260833, Plaintiff claimed CSP medical staff refused to treat him for chronic nerve pain on his left side.  (Id. at 102-03.)

The remaining seven grievances relate to this lawsuit.  On May 16, 2016, Plaintiff filed grievance 219026 at DSP, stating DSP administration and Officers Tarver and Foster failed in their duties on May 10, 2016, which caused him to lose an ear.  (Doc. no. 53-11, p. 5.)  Plaintiff stated he went to the control booth after the first physical and verbal altercation, but there were no officers around.  (Id.)  Plaintiff stated he beat on the control booth window for five to six minutes and, when one officer appeared, he showed the officer his ear in his hand and the hole on the side of his head.  (Id.)  Plaintiff alleged he would still have his ear if he would have been able to get an officers' attention after the first attack and Rashad Smith would never have been able to bite off his ear.  (Id.)  On June 16, 2016, Warden Zanders denied Plaintiff's grievance, stating the allegations could not be substantiated because the officers were busy when the altercation began and Officer Gilbert called for assistance as soon as he realized what was happening.  (Id. at 6.)  Plaintiff appealed the denial, and the Central Office denied the appeal on December 1, 2016, but noted an investigation was ongoing.  (Id. at 1-4.)

On June 2, 2016, Plaintiff filed grievance 220087 at DSP, stating DSP administrators and Dr. Esmail were violating his Eighth Amendment rights by failing to send him to an ear specialist within a reasonable amount of time.  (Id. at 20.)  Plaintiff stated his ear was bitten off on May 10, 2016, and he was rushed to the hospital, given "I.V. drugs," and sent to a plastic surgeon, who "look[ed] at me for a few minutes [and] started stitching up the wound." (Id.)  Plaintiff stated the plastic surgeon told him to follow up with an ear doctor immediately.  (Id.)  Plaintiff noted no x-rays were taken until June 19, 2016, when he was taken back to the hospital due to swelling in his ear and throat and bleeding in his ears.  (Id.) Plaintiff stated he was given another IV and received a recommendation to see an ear doctor immediately.  (Id.)  On July 1, 2016, Warden Zanders denied Plaintiff's grievance, noting Plaintiff had a pending consult with an ear, nose, and throat specialist.  (Id. at 18.)  There was no appeal.  (Doc. no. 53-5, p. 1.)

On August 4, 2016, Plaintiff filed grievance 225114 at WSP, stating medical nurses would not respond to his request forms from the week of August 1, 2016, regarding migraine headaches and a loud ringing in his right ear. (Doc. no. 53-11, p. 28.)  Plaintiff stated he was in extreme pain and the noise was causing him to question his sanity.  (Id.)  Plaintiff stated medical personnel would respond to any matter other than his head and ear.  (Id.)  On August 26, 2016, prison officials denied Plaintiff's grievance, stating (1) Plaintiff had been seen in medical; (2) audiology and plastic surgery consults had been scheduled; and (3) Plaintiff had been prescribed Neurontin for pain.  (Id. at 25.)  There was no appeal.  (Doc. no. 53-5, p. 1.)

On November 16, 2016, Plaintiff filed grievance 231849 at ASMP, stating Dr. Bohannon refused to treat his ear, even though Plaintiff was diagnosed with tinnitus. (Doc.

no. 53-11, p. 31.)  Plaintiff stated Dr. Bohannon said there was nothing he could do about the ringing in Plaintiff's ear and head, even though he knew there was medication available. (Id.)  On January 3, 2017, Warden Wilkes denied Plaintiff's grievance based on a statement by Dr. Alston that Plaintiff's concerns about tinnitus should be discussed with his primary physician at WSP.  (Id. at 32.)  There was no appeal.  (Doc. no. 53-5, p. 1.)

On January 12, 2017, Plaintiff filed grievance 235347 at WSP, stating WSP medical personnel were neglecting his medical needs by refusing to perform a follow-up after his scheduled surgery at ASMP was cancelled.   (Id. at 61.)   Plaintiff complained medical personnel would not answer his requests for them to reschedule the surgery and were not doing their job to make sure he saw the doctors at ASMP.  (Id.)  On February 24, 2017, prison officials partially denied Plaintiff's grievance, noting a request for a surgical consult had been entered and was awaiting approval.  (Id. at 53-54.)  There was no appeal.  (Doc. no. 53-3, p. 1.)

On June 23, 2017, Plaintiff filed grievance 245616 at ASMP, stating ASMP administration was neglecting his medical needs by failing to perform surgery on his right ear.  (Doc. no. 53-11, pp. 71-72.; doc. no. 61-2, p. 16.)  Plaintiff stated he was taken to ASMP for surgery on May 16, 2017, but the surgery was cancelled after his pre-op physical without explanation.  (Id.)  Plaintiff stated he continues to get ear infections because the surgery had not been performed.  (Id.)  On August 1, 2017, Warden Wilkes partially granted Plaintiff's grievance based on a statement by Dr. Alston noting Plaintiff's concerns and stating an appointment has been scheduled with a surgeon.  (Doc. no. 53-11, p. 71.)  Plaintiff

appealed, and the grievance was forwarded to the medical department on September 5, 2017. (Id. at 71-72.)  When Plaintiff did not receive a response within 100 days, the grievance was deemed exhausted.  (Doc. no. 53-2, p. 7.)

Finally, on August 1, 2017, Plaintiff filed grievance 249024 at WSP, stating he filed an appeal regarding grievance 235437 on March 14, 2017, that is overdue, and WSP is tampering with grievances concerning his ear.  (Doc. no. 53-5, p. 85.)  On September 5, 2017, prison officials denied Plaintiff's grievance because Plaintiff acknowledged receipt of grievance 235473 and no grievance appeal was received.  (Id. at 83.)  There was no appeal. (Doc. no. 53-5, p. 1.)

## II.     ANALYSIS

### A.     The Legal Framework

Where, as here, a defendant has filed a motion to dismiss a claim based on failure to exhaust administrative remedies, the Eleventh Circuit has laid out a two-step process for courts to use in resolving such motions.  First, the court looks to the factual allegations made by both parties, taking the plaintiff's version as true where they conflict, and if in that light the complaint is subject to dismissal for failure to exhaust administrative remedies, the defendant's motion will be granted.  Turner v. Burnside, 541 F.3d 1077, 1082-83 (11th Cir. 2008) (citing Bryant v. Rich, 530 F.3d 1368, 1373-74 (11th Cir. 2008) (citations omitted)).  If the complaint is not subject to dismissal at the first step, then at step two the court makes specific findings to resolve the disputed factual issues, with the defendant bearing the burden of proving that Plaintiff has failed to exhaust his administrative remedies.  Id.  Based on its findings as to the disputed factual issues, the court determines whether the prisoner has exhausted his available

administrative remedies and thus whether the motion to dismiss should be granted. Id. Because exhaustion "is treated as a matter of abatement and not an adjudication on the merits, it is proper for a judge to consider facts outside the pleadings and to resolve factual disputes so long as the factual disputes do not decide the merits and the parties have sufficient opportunity to develop a record." Bryant, 530 F.3d at 1376 (citations omitted).

Section 1997e(a) of the Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). In the Eleventh Circuit, "brought" as used in this section of the PLRA means "the filing or commencement of a lawsuit, not . . . its continuation." Harris v. Garner, 216 F.3d 970, 974 (11th Cir. 2000) (en banc); see also Goebert v. Lee Cty., 510 F.3d 1312, 1324 (11th Cir. 2007) ("The time the statute sets for determining whether exhausting of administrative remedies has occurred is when the legal action is brought, because it is then that the exhaustion bar is to be applied."). Because exhaustion of administrative remedies is a "precondition" to filing an action in federal court, the Eleventh Circuit requires prisoners to complete the administrative process *before* initiating suit. Poole v. Rich, 312 F. App'x 165, 166 (11th Cir. 2008) (per curiam); see also Higginbottom v. Carter, 223 F.3d 1259, 1261 (11th Cir. 2000). "The filing of a civil suit without properly exhausting all available administrative remedies is a procedural misstep that is fatal to the underlying case." McKeithen v. Jackson, 606 F. App'x 937, 939 (11th Cir. 2015) (per curiam) (citing Johnson v. Meadows, 418 F.3d 1152, 1158-59 (11th Cir. 2005)).

13

The PLRA's mandatory exhaustion requirement "applies to all prisoners seeking redress for prison circumstances or occurrences." Porter v. Nussle, 534 U.S. 516, 520 (2002). Moreover, the Court does not have discretion to waive the requirement, even if it can be shown that the grievance process is futile or inadequate. See Smith v. Terry, 491 F. App'x 81, 83 (11th Cir. 2012) (per curiam) (citing Alexander v. Hawk, 159 F.3d 1321, 1325-26 (11th Cir. 1998)). Under the PLRA, the Court has no discretion to inquire into whether administrative remedies are "plain, speedy, [or] effective." Porter, 534 U.S. at 524; see also Alexander, 159 F.3d at 1326. Rather, under the PLRA's "strict exhaustion" requirement, administrative remedies are deemed "available" whenever "'there is the possibility of at least some kind of relief.'" Johnson, 418 F.3d at 1155, 1156.

Additionally, "implicit in [the exhaustion] requirement is an obligation on the prisoner to provide those officials who will pass upon the grievance all the relevant information he has, including the identity of any officials he thinks have wronged him and any witnesses." Brown v. Sikes, 212 F.3d 1205, 1207-08 (11th Cir. 2000); see also Sewell v. Ramsey, No. CV 406-159, 2007 WL 201269, at *3 (S.D. Ga. Jan. 24, 2007) ("a grievance satisfies § 1997e(a)'s exhaustion requirement so long as it provides prison officials with enough information to investigate and address the inmate's complaint internally"). This does not require a prisoner to provide information he does not have or cannot reasonably obtain, but it does require a prisoner to include "relevant information about his claims, including the identity of those directly involved in the alleged deprivation . . . ." Brown, 212 F.3d at 1210; see also Thompson v. Corr. Corp. of Am., No. CV 510-069, 2011 WL 6941680, at *3 (S.D. Ga. Aug. 30, 2011), report and recommendation adopted, No. CV 510-069, 2012 WL 12682

14

(S.D. Ga. Jan. 3, 2012), aff'd, 485 F. App'x 345 (11th Cir. 2012) ("Plaintiff need not have used any particular words or phrases in his informal grievances.  Nevertheless, there must be some assertion set forth in a grievance, whether informal or formal, which would alert the person against whom the grievance was filed that the inmate's complaint concerned him or her.").

        "While a prisoner is not required to name each defendant in a grievance in order to properly exhaust a claim, he is required to 'provide as much relevant information as he reasonably can in the administrative grievance process.'"  Williams v. Barrow, 559 F. App'x 979, 986 (11th Cir. 2014) (citing Jones v. Bock, 549 U.S. 199, 219 (2007) and Brown, 212 F.3d at 1207).  Indeed, "[t]he critical function of the grievance process is that it provides the institution with notice of a problem such that they have an opportunity to address the problem internally."  Toenninges v. Georgia Dep't of Corr., 600 F. App'x 645, 649 (11th Cir. 2015).

        Furthermore, the PLRA also "requires proper exhaustion."  Woodford v. Ngo, 548 U.S. 81, 93 (2006).  In order to properly exhaust his claims, a prisoner must "us[e] all steps" in the administrative process; he must also comply with any administrative "deadlines and other critical procedural rules" along the way.  Id. at 90 (internal quotation omitted).  If a prisoner fails to complete the administrative process or falls short of compliance with procedural rules governing prisoner grievances, he does not satisfy the exhaustion requirement.  Johnson, 418 F.3d at 1159.

### B.    The Administrative Grievance Procedure

Based on the date of the alleged incidents, the administrative grievance procedure applicable in this case is the version of the GDOC's Standard Operating Procedure ("SOP") IIB05-0001, which became effective on July 20, 2015.  (Doc. no. 53-3.)  The administrative remedies procedure commences with the filing of the Original Grievance, and the inmate has ten calendar days from "the date the offender knew, or should have known, of the facts giving rise to the grievance" to sign the Original Grievance and give it to a Counselor.  Id. § VI(D)(1)-(4).  "The complaint on the Grievance Form must be a single issue/incident."  Id. § VI(D)(2).  Once the Counselor gives the grievance to the Grievance Coordinator, they will screen it in order to determine whether to accept it or recommend that the Warden reject it. Id. § VI(D)(3), (5)(a).  If the Warden rejects the grievance, the inmate may appeal the rejection to the Central Office.  Id. § VI(D)(5)(f).

If the Grievance Coordinator accepts the grievance or the Warden rejects the coordinator's recommendation to reject the grievance, the Grievance Coordinator will appoint a staff member to investigate the complaint.  Id. § VI(D)(6).  After the staff member prepares a report, the Grievance Coordinator submits a recommended response to the Warden. Id. The Warden or a designee reviews the grievance, the report, and the recommendation and issues a decision in writing.  Id.  The Warden has forty days from the date the offender gave the Original Grievance to the Counselor to deliver a decision, but a onetime ten calendar day extension may be granted.  Id. § VI(D)(7).

The inmate then has seven calendar days from the date they receive the response to file a Central Office Appeal to the Office of the Commissioner, but this time limit may be

waived for good cause.  Id. § VI(E)(2).  If the Original Grievance is rejected, or if the time

allowed for a response to the Original Grievance has expired without action, the offender

may file a Central Office Appeal.  Id. §§ VI(E)(3)-(4).  The Office of the Commissioner or

his designee then has 100 calendar days after receipt of the grievance appeal to deliver a

decision to the offender, at which time the grievance procedure is complete.  Id. § VI(E)(7).

### C.   Plaintiff Failed to Exhaust Administrative Remedies as to His Claims Regarding His First Surgery

Plaintiff alleges Defendants Zanders, Sanders, Inman, Esmail, and Syribeys were

deliberately indifferent to his serious medical needs by deciding on May 10, 2016, not to

reattach Plaintiff's ear because it was easier and cheaper, even though it was a less effective

course of treatment.  Taking Plaintiff's factual allegations as true according to the first step

under Turner, Plaintiff's deliberate indifference claims against these Defendants regarding

his first surgery are subject to dismissal because Plaintiff did not include the factual basis for

these claims in his grievances.  Woodford, 548 U.S. at 90; Johnson, 418 F.3d at 1159.  In his

responses to the motions to dismiss, Plaintiff argues he exhausted as to his claims regarding

his first surgery by filing grievances 219026, 220087, and 245616.  (Doc. nos. 61, pp. 5-6;

66, pp. 2-3.)  The Court has carefully reviewed these grievances and finds they do not

exhaust these claims regarding his first surgery.

#### 1.   Grievance 219026

Plaintiff argues grievance 219026 exhausts his remedies because it describes the

events that "started [his] serious medical needs . . . ."  (Doc. no. 66, p. 2.)  However,

grievance 219026 only describes the inmate attack and the officers' response.  (Doc. no. 53-

11, p. 5.)  The grievance has nothing at all to do with Plaintiff's first surgery or any other treatment received.  Furthermore, neither Plaintiff's grievance appeal form nor the one-page attachment mention anything about his medical treatment following the attack.  (Id. at 3-4.) Accordingly, grievance 219026 does not exhaust Plaintiff's administrative remedies as to these claims.

### 2.      Grievance 220087

Plaintiff argues grievance 220087 exhausts his administrative remedies regarding his first surgery because he complains Dr. Syribeys only reviewed him for a few minutes before stitching up the wound and did not x-ray him prior to surgery, and there were later complications such as bleeding.  (Doc. no. 61, p. 5.)

Grievance 220087 complains about the care Plaintiff received after the first surgery. It never mentions anything about a deliberate decision by Defendants Zanders, Sanders, Inman, Esmail, and Syribeys to forego surgical reattachment of his ear because of the expense, which is the allegation giving rise to this deliberate indifference claim.  Thus, grievance 220087 would not have put prison officials on notice Plaintiff was attempting to grieve the alleged decision such that they would have had an opportunity to address the problem internally.  Toenninges, 600 F. App'x at 649.  Therefore, even taking Plaintiff's allegations as true in accordance with the first step of the Turner analysis, Plaintiff's claims as to his first surgery are subject to dismissal.  Turner, 541 F.3d 1082-83.

However, even if the Court found under the first step of Turner Plaintiff had properly exhausted his claims regarding his first surgery, the claim would still be subject to dismissal

under the second step of <u>Turner</u>, because Plaintiff failed to properly exhaust grievance 220087 by failing to appeal denial of the grievance.  (<u>See</u> doc. no. 53-5, p. 1.)

Plaintiff argues he was unable to appeal grievance 220087 because Ms. Roberson at WSP refused to accept his appeal form on July 12, 2016.  (Doc. no. 61-1, p. 4.)  Taking Plaintiff's factual allegations as true, in accordance with the first step of the <u>Turner</u> analysis, the Court must proceed to step two of the analysis and make specific findings to resolve the factual dispute.  <u>Turner</u>, 541 F.3d 1082-83.

Defendants argue Plaintiff's allegations are belied by his grievance history.  Plaintiff filed two grievances at ASMP, including grievance 220087, and appealed the denial of grievance 219026 on July 18, 2016, while incarcerated at WSP. (Doc. no. 53-11, p. 1.) Furthermore, Plaintiff filed three new grievances at WSP, including grievance 225114 on Augusta 4, 2016.  (<u>Id.</u>)   Thus, Plaintiff grievance history indicates Plaintiff was well-versed in the grievance system and freely filed new grievances and appeals of grievances during the relevant time period.

Additionally, Plaintiff gives no indication in his appeal of grievance 219026 or the attachment thereto DSP officials hindered his ability to use the grievance procedure as to any other grievances.  (<u>Id.</u> at 3-4.)  Thus, Plaintiff offers no factual detail or evidence to support his claim he failed to exhaust as to grievance 220087 because of interference by prison staff. Becuase Plaintiff failed to appeal grievance 220087, it does not satisfy the exhaustion requirement. <u>Woodford</u>, 548 U.S. at 90; <u>Johnson</u>, 418 F.3d at 1159.

### 3.      Grievance 245616

Plaintiff argues grievance 245616 exhausts his remedies as to his claims about his first surgery because it describes Plaintiff's symptoms, which were the result of his first surgery.  (Doc. no. 61, p. 5.)  However, in grievance 245616, Plaintiff complains exclusively about the medical administration at ASMP delaying a second surgery, which caused him to suffer.  (Doc. no. 61-2, p. 16.)  While Plaintiff's symptoms may be causally related to the attack and the first surgery, grievance 245616 does not discuss Plaintiff's first surgery and Defendants' alleged decision to forego surgical ear reattachment.  Furthermore, Plaintiff filed grievance 245616 more than one year after his first surgery.  Thus, nothing about grievance 245616 would reasonably put prison administrators on notice Plaintiff was complaining about the first surgery.  Accordingly, grievance 245616 does not exhaust Plaintiff's administrative remedies as to these claims and Defendants' motions to dismiss as to Plaintiff's claims about his first surgery should be granted.

### D.      Plaintiff Exhausted his Administrative Remedies as to His Claims Regarding Prison Officials Delaying His Second Surgery

Plaintiff alleges Defendants Wilkes, Alston, and Ritter were deliberately indifferent to his serious medical needs by delaying his second surgery from November 29, 2016, when the surgery was originally scheduled, to October 7, 2017, when the surgery occurred.  Taking Plaintiff's factual allegations as true according to the first step under Turner, Plaintiff exhausted his administrative remedies as to this claim against Defendants Wilkes, Alston, and Ritter by filing grievance 245616 and appealing its denial.

In grievance 245616, Plaintiff stated "Augusta State Prison medical administration" was neglecting his needs by failing to perform a second surgery on his ear.  (Doc. no. 61-2,

p. 16.)  Defendants contend grievance 245616 lacks the specificity required to exhaust his claims, as Plaintiff failed to name any Defendant in his grievance even though Defendants Wilkes, Alston, and Ritter's identities were reasonably available to Plaintiff.  (Doc. no. 53-1, p. 9 (citing Brown, 212 F.3d at 1207).)  While a prisoner is obliged to provide as much information as is reasonably possible in a grievance in order to exhaust a claim, the critical function of the grievance process is to provide the institution with notice of a problem and an opportunity to address the problem internally.  Toenninges, 600 F. App'x at 649.

Grievance 245616 satisfies the minimal specificity requirement as to Plaintiff's deliberate indifference claims against Defendants Wilkes, Alston, and Ritter.  Plaintiff complained "Augusta State medical administration" neglected his medical needs by postponing his surgery scheduled for May 28, 2017, without providing him an explanation. (Doc. no. 61-2, p. 16.)  Plaintiff stated this was the fourth time his appointment was cancelled and he faced the risk of additional infections due to the delay.  (Id.)  Although Plaintiff does not specify Defendants by name, he provided enough information for prison administration to address the problem internally.

ASMP addressed the problem internally by communicating with Dr. Alston, even without Plaintiff providing her name in the grievance.  (Doc. no. 53-11, p. 71.)  Indeed, ASMP officials were able to determine Dr. Alston was directly involved, and her statement indicating an appointment was scheduled formed the basis for Warden Wilkes partially granting grievance 245616.  (Doc. no. 53-11, p. 1.)

Additionally, in grievance 245616, Plaintiff complains about surgery being cancelled on three occasions prior to May 18, 2017, and, in his response, Plaintiff provides

21

documentation showing Dr. Ritter was scheduled to perform Plaintiff's surgery on December 2, 2016.  (Doc. no. 61-2, pp. 16, 26-27.)  Thus, prison officials could reasonably determine Dr. Ritter's potential involvement based on a review of Plaintiff's recent medical history regarding his cancelled surgeries.

Finally, as to Warden Wilkes, Plaintiff need not have named him in his grievance to exhaust the claim against him.  See Brown, 212 F.3d at 1209 ("[N]aming the warden . . . in a grievance simply because they are the top officials in charge of the prison would not have advanced any of the policies underlying the exhaustion requirement. . . . There is no point in making a prisoner name them in his grievance, unless they were somehow personally involved . . . .")

Although it would have been preferable for Plaintiff to provide Defendants' names, there is no indication he failed to provide "as much relevant information as he reasonably [could] in the administrative grievance process," which was all that was required.  Williams, 559 F. App'x at 986.  Accordingly, Plaintiff properly exhausted the administrative process regarding his deliberate indifference to a serious medical need claims against Defendants Wilkes, Alston, and Ritter.

## III.   CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** Defendants Zanders, Sanders, Wilkes, Esmail, Alston, Ritter, and Inman's partial motion to dismiss be **GRANTED IN PART** and **DENIED IN PART**, (doc. no. 53), Defendant Syribeys's motion to dismiss be **GRANTED**, (doc. no. 63), and Defendants Zanders, Sanders, Esmail, Inman, and Syribeys be **DISMISSED** from this case.  The case should proceed as to

(1) Plaintiff's deliberate indifference to a serious medical need claim against Defendants Wilkes, Alston, and Ritter for allegedly delaying his second surgery; and (2) Plaintiff's deliberate indifference to safety claim against Defendant Gilbert regarding his alleged conduct during the May 10, 2016 attack.

SO REPORTED and RECOMMENDED this 9th day of January, 2019, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA