IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

| | |
|---|---|
| ANTONIO LAMAR DUNHAM, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CV 318-018 |
| | ) |
| TREVON GILBERT, Correctional Officer; | ) |
| SCOTT WILKES, Warden; DR. MARY | ) |
| ALSTON; and DR. RITTER, | ) |
| | ) |
| Defendants. | ) |

_____

**O R D E R**
_____

Plaintiff, an inmate at Baldwin State Prison in Hardwick, Georgia, commenced the above-captioned case pursuant to 42 U.S.C. § 1983. For the reasons stated below, the Court **DENIES** Plaintiff's motion to compel. (Doc. no. 95.)

**I.  BACKGROUND**

    **A.  Amended Complaint Allegations**

        **1.  Assault**

On April 25, 2016, while Plaintiff was incarcerated at Dodge State Prison ("DSP"), Plaintiff wrote DSP Warden Zanders about being moved to a different room because his cellmate, Rashad Smith, threatened Plaintiff and "told him he had to go [be]cause he didn't trust [Plaintiff]." (Doc. no. 1, p. 11.) Warden Zanders never responded. (Id.) On May 2, 2016, Warden Zanders inspected the dorm, and Plaintiff asked him if he received the letter. (Id.) Warden Zanders told Plaintiff he did not and instructed him to write another. (Id.) Plaintiff did

so but received no response. (Id.) Warden Zanders failed to move Plaintiff despite knowing Smith had previously "bitten off a piece" of a former cellmate's ear. (Id. at 23.)

On May 10, 2016, Plaintiff returned to his room from putting his bed sheets in the laundry cart to find Smith had locked the door and would not let in Plaintiff. (Id. at 7.) Plaintiff asked Smith why Smith had not allowed Plaintiff to put on his leg brace and pants. (Id.) Smith "burst[] out of the room howling I'm tired of your shit," and attacked Plaintiff. (Id.) Smith attempted to drag Plaintiff into their room and bit Plaintiff on his hand and head. (Id.)

After Smith stopped attacking, Plaintiff went to the control booth to get medical attention. (Id.) Officers Trevon Gilbert and an unidentified officer were not in the control booth, so Plaintiff began beating the windows of the control booth. (Id. at 8.) The officers, who were serving breakfast in another dorm, came into view through the window. (Id.) Plaintiff showed Officer Gilbert he was bleeding from his face and hand. (Id.) Officer Gilbert "turned his back on" Plaintiff, and the officers "refused to respond." (Id.)

When Smith left their room, Plaintiff returned to put on his leg brace and pants. (Id.) Smith returned, "grabbed [Plaintiff] in a headlock and stated sense [sic] I know I'm going to lockdown I'm gonna give you something to remember me by forever." (Id.) Smith "put [Plaintiff's right] ear in his mouth and ripped it completely out of [Plaintiff's] head leaving a big hole." (Id.) Plaintiff returned to the control booth and "beat on the window for several minutes" until Officer Gilbert saw him. (Id.) Plaintiff showed Officer Gilbert the injury, and Officer Gilbert called his supervisor to the scene. (Id.) The officers took Plaintiff to medical, and a nurse placed Plaintiff's ear in saline and ice for reattachment at the hospital. (Id.)

2

## 2. First Ear Surgery and Post-Operative Care

Officers transported Plaintiff to a hospital in Dublin, where he received medication. (Id. at 9.) A doctor at the hospital told Plaintiff of the need to transfer him to Dr. Syribeys in Macon for surgery and Dr. Syribeys's opinion, stated in a phone call, that the ear could not be reattached. (Id.) Officers took Plaintiff to Dr. Syribeys in Macon. (Id.) Plaintiff asked Dr. Syribeys if he was sure there was no way for the ear to be reattached, and Dr. Syribeys told him "there's no way medically possible . . . ." (Id.) After the transfer, Plaintiff "was left with no choice but to let Dr. Syribeys do the surgery." (Id.) After surgery, Dr. Syribeys said no follow-up appointment was necessary and the ear should stop bleeding in four days. Drs. Syribeys and Nurallah Esmail and DSP Wardens Zanders, Sanders, and Inman decided not to reattach Plaintiff's ear because it was "an easier cheaper but much less effective course of treatment." (Id. at 22.)

Officers returned Plaintiff to Dodge State Prison. (Id. at 9.) Dr. Esmail ordered Nurses Jackson and April to clean the blood from Plaintiff's ear canal with cotton swabs and a mixture of saline and peroxide. (Id.) Beginning on May 16, 2016, Plaintiff complained to Dr. Esmail and Nurses April, Smith, and Jackson about extreme pain, bleeding, headaches, and loud ringing in his right ear, but they told Plaintiff nothing was wrong. (Id. at 10.) On May 19, 2016, Plaintiff was rushed back to the Dublin hospital with extreme pain and swelling in his neck. (Id.) A doctor diagnosed Plaintiff with an infection, prescribed antibiotics, and recommended Plaintiff see a specialist immediately. (Id.)

On May 23, 2016, Plaintiff was still bleeding out of his right ear. (Id.) Dr. Esmail told Nurse April to clean the blood from Plaintiff's infected ear, but she refused, saying she did not

3

want to lose her license for performing the procedure. (Id.) Nurse Smith cleaned Plaintiff's ear instead. (Id.) Nurse April told Plaintiff she did not know why Dr. Esmail would not send him to a specialist. (Id.) After Nurse April's statement, Plaintiff began contacting family members to contact prison officials on his behalf. (Id.) "Dodge Medical and Counselor Ms. Fuqua Chief" told Plaintiff's sister Plaintiff would be sent out for treatment soon, but he never was. (Id.)

### 3. Complaints and Grievances

On May 25, 2016, Warden Zanders visited the unit where Plaintiff was located, and Plaintiff informed him of his symptoms and Dr. Esmail's refusal to send Plaintiff for outside medical attention. (Id. at 11.) Plaintiff showed Warden Zanders the bleeding and asked for medical attention. (Id.) Warden Zanders said he would "see what he could do," but Plaintiff did not hear from Warden Zanders again until he denied Plaintiff's grievance regarding Dr. Esmail two months later. (Id.) By May 28, 2016, Plaintiff was "suffering from mental depression caused by extreme pain and medical neglect." (Id.) Warden of Care and Treatment Sanders came to Plaintiff's cell, and Plaintiff showed her the blood on his pillow and asked why medical was not providing additional treatment. (Id.) Warden Sanders only slammed the cell door window flap in Plaintiff's face. (Id.)

Warden Zanders had a subordinate tamper with Plaintiff's reports regarding the attack and hindered or tampered with Plaintiff's mail, grievance forms, disciplinary forms, and medical files. (Id. at 12, 22.) On June 14, 2016, Plaintiff filed a grievance against disciplinary investigator Ms. Scott for "misleading and abusing disciplinary proc[e]dures by forging and/or adding words to [Planitiff's] disciplinary forms" regarding the attack by Smith. (Id. at 12.) Ms. Scott came to Plaintiff's cell after the attack to ask if Plaintiff had anything to tell Warden

4

Zanders about the attack. (Id.) Plaintiff gave a statement to Ms. Scott, who said she would write down what Plaintiff said. (Id.) Ms. Scott gave Plaintiff a blank form to sign and told Plaintiff there would be a disciplinary hearing soon, but none ever occurred. (Id.) Dodge Prison, the Georgia Department of Corrections, administration, security, and medical staff attempted to hinder Plaintiff from filing a complaint about the attack. (Id.)

### 4. Prison Transfer and Second Ear Surgery

Between June 16, 2016, and June 22, 2016, Plaintiff was transferred to Washington State Prison ("WSP") "for flooding his cell after being refused medical attention." (Id.) WSP Warden Michael Conley asked Plaintiff about the attack at DSP and told Plaintiff to write him a letter so he could investigate the matter. (Id. at 13.) Warden Conley returned a few weeks later and told Plaintiff he did not think Plaintiff was being treated fairly and he was going to do everything he could to make sure medical would stop the bleeding in Plaintiff's ear. (Id.) However, WSP counselors Ms. Roberson, Ms. Davis, and Ms. Atkins "hinder[ed] and threaten[ed]" Plaintiff for asking to see grievance responses. (Id.) They also denied Plaintiff's request for mental health assistance. (Id.)

During July 2016, Plaintiff was transferred to Augusta State Medical Prison ("ASMP"). (Id. at 14.) Dr. Marc Leduc[1] ran tests and recommended surgery to open Plaintiff's ear canal, replace his right ear lobe, stop the infection, and improve hearing. (Id.) Dr. Leduc informed Plaintiff the bleeding had almost stopped and prescribed medication for headaches and dizziness. (Id.) Dr. Leduc also recommended the nurses stop cleaning out Plaintiff's ear with the medical

5

swabs and said the nurses "should not have been doing that." (Id.) Dr. Leduc asked Plaintiff why Dr. Syribeys did not perform a follow-up evaluation. (Id.)

Dr. Leduc tried to perform surgery on Plaintiff's ear for almost two years, but ASMP Warden Scott Wilkes and medical administrators Drs. Alston and Edmond Ritter rescheduled and delayed surgery on November 29, 2016, May 18, 2017, and September 28, 2017. (Id.) Officials would take Plaintiff's blood and give him a pre-operation physical but they would not perform the surgery. (Id.) During the delay, Plaintiff was treated for at least eight ear infections, dizzy spells, extreme pain, migraine headaches, loud ringing in his head, head injuries from falling, and depression. (Id. at 15.)

After Plaintiff requested forms for filing a lawsuit about the attack, ASMP officials decided to perform surgery. (Id.) On October 7, 2017, doctors performed ear reconstruction surgery on Plaintiff's right ear. (Id.) Following the surgery, the doctors told Plaintiff at least two additional surgeries would be required to "get [Plaintiff's] ear back to satisfactory form." (Id.) However, Plaintiff refused additional surgery because "the doctors messed up [his] arm during the ear surgery." (Id.) The doctors put Plaintiff on antibiotics and pain medication to reduce the swelling and pain in Plaintiff's arm, but he continues to suffer from extreme pain in his arm and left side. (Id.) Plaintiff has complained about the pain, but Central State Prison's medical department is ignoring his requests. (Id.) Plaintiff has written medical administrators at Central State Prison about reviewing his medical file, but they have refused to respond. (Id. at 16.)

---

[1]Plaintiff identified this provider as Dr. R. Bohannon in his original complaint. On March 6, 2019, the Court granted Plaintiff's motion to amend to correctly identify the provider

### B. Discovery Dispute

On January 22, 2019, Plaintiff served eight requests for production of documents on Defendants. (Doc. no. 95, pp. 2-23.) Defendants responded on February 22, 2019, and objected to six of Plaintiff's requests. (Id. at 13-17.) On April 8, 2019, Plaintiff responded to Defendants' objections and served a second set of five document requests concerning the same subject matter as his first document requests; namely, Plaintiff's medical records, grievances, and disciplinary reports regarding Defendants. (See Id. at 1-3, 13-21.) The second set of requests are more limited in breadth than the first requests. (Id.)

On May 12, 2019, Plaintiff filed the present motion to compel after Defendants failed to respond to his April 8th response to Defendants' objections and second requests. (Id. at 3-4.) On May 15, 2019, Plaintiff submitted a supplemental notice, stating he received Defendants' response to his second requests on May 14, 2019, but resolution of the motion to compel remains necessary because Defendants relied on the same responses as they did in their response to Plaintiff's first requests. (Doc. no. 96.)

On June 3, 2019, Defendants responded to Plaintiff's motion to compel, arguing Plaintiff's motion should be denied on the merits. (Doc. no. 98, p. 3.) While Defendants noted it is unclear with which of Defendants' objections Plaintiff takes issue, they nevertheless addressed each of Plaintiff's first requests. (Id.) Furthermore, Defendants attached their May 8 and May 30, 2019 responses to Plaintiff's second requests, indicating they since produced an additional 150 pages of Plaintiff's medical files. (Doc. nos. 98-2, 98-3.)

---

as Dr. Marc Leduc. (Doc. no. 75.)         7

On June 10, 2019, the Court ordered Plaintiff to reply to Defendants' responses indicating which requests remained at issue following the supplemental production. (Doc. no. 102.) On June 20 and 30, 2019, Plaintiff submitted replies in accordance with the Court's Order stating document requests one and three were still unresolved and indicating Defendants failed to respond to his interrogatories dated May 13, 2019. (Doc. nos. 105, 106.)

## II. DISCUSSION

Under Fed. R. Civ. P. 26(b)(1), "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . . Information within this scope of discovery need not be admissible in evidence to be discoverable." The Federal Rules of Civil Procedure strongly favor full discovery whenever possible, Republic of Ecuador v. Hinchee, 741 F.3d 1185, 1189 (11th Cir. 2013), and "[w]hen there is a doubt over relevancy, the court should still permit discovery," Coker v. Duke & Co., 177 F.R.D. 682, 685 (M.D. Ala. 1998).

### A. Defining the Scope of Relevant Discovery

Plaintiff's remaining claims are based on Officer Gilbert's alleged failure to protect Plaintiff after the first attack on April 25, 2016, and Defendants Wilkes, Alston, and Ritter's failure to effect Plaintiff's second ear surgery in a timely manner. (See generally doc. nos. 1, 13, 70, 76.) The Court now turns to a discussion of the disputed requests.

### B. Disputed Document Requests

Remaining in dispute are two document requests by Plaintiff. (Doc. no. 105, 106.) The Court addresses each in turn.

> *1. Any and all G.D.C. policies or regulation, directives, and instructions of correctional officers concerning safety issues, monitoring or control booths in a dorm like A-3 and A-4 with lockdown and population dorm being in the same building like the one at Dodge State Prison.*
> *I'm requesting policies and regulations to answer the following questions.*
> *(B) How many officers are required to be in a population and lockdown Unit or building like A-3 and A-4 at Dodge State Prison?*
> *(C) Does a supervisor have to be in a population and lockdown unit like the one at Dodge State Prison at all times during the month of May 2016.*
>
> *RESPONSE: Defendants object to this Request as unlimited in time, Objecting further, the term "safety issues" is overly broad, vague, and ambiguous, and objectionable to the extent it seeks documents unrelated to the claims at issue in Plaintiff's Complaint. Defendants object to this Request as seeking irrelevant information; the issue in Plaintiff's Complaint is whether Officer Trevon Gilbert ignored Plaintiff's request for assistance on May 10, 2016. Policies pertaining to the number of officers employed in a lockdown unit and the presence of a supervisor in a lockdown unit are irrelevant to the claims and defenses at issue in this lawsuit. Finally, Defendants object to this Request as presenting security concerns. While Georgia Department of Corrections ("GDC") Standard Operating Procedure ("SOP") II107-0007, effective on March 1, 2005, is responsive to this request, Defendants maintain that production of this policy to an inmate represents a security risk to the operation of the GDC as this policy discusses classified facility protocol and operations.*

Plaintiff argues the SOPs are relevant to prove Officer Gilbert's conduct on May 10, 2016; namely, that he ignored Plaintiff's plea for help and violated prison policy by not being inside the control booth to allow Plaintiff out of the dorm. (Doc. no. 105, p. 4.)

The SOPs requested by Plaintiff are irrelevant to his claim against Officer Gilbert, which is based solely on his alleged failure to prevent the second attack after seeing Plaintiff's injuries following the first attack. (See doc. no. 12, pp. 11-12; doc. no. 13, p. 7.)

9

Plaintiff provides no explanation for why the SOP would be probative of why Officer Gilbert allegedly ignored Plaintiff's plea for help on May 10, 2016. Accordingly, because Plaintiff has provided no basis for determining the SOPs would be probative of his claims against Officer Gilbert, the Court **DENIES** Plaintiff's motion as to document request one.

> *3. Any and all statements written by Officer Gilbert concerning the incident on May 10, 2016 about Dunham's attack including formal grievance and grievance appeal response.*
>
> *RESPONSE: Please see the attached for documents responsive to this Request, Bates labeled DUNHAM RPD-000001.*

Plaintiff argues Defendants' response is deficient because they failed to provide his appeal of grievance number 245616, which concerns his allegations concerning delay of treatment. (Doc. no. 106, pp. 3-4.) However, Defendants correctly note Plaintiff's own grievance does not fall within the scope of his request, which is limited to statements written by Officer Gilbert. (Doc. no. 107, pp. 4-5.) Defendants state they have produced all documents responsive to his request. (Id.) Defendants are not responsible for producing documents outside the scope of Plaintiff's requests. Accordingly, the Court **DENIES** Plaintiff's motion as to document request three. If Plaintiff wishes to request the grievance appeal form for grievance number 245616, he may do so prior to the close of discovery on August 9, 2019. (See doc. no. 84.)

### C.     May 13, 2019 Interrogatories

In his second reply brief, Plaintiff states Defendants failed to respond to interrogatories served by mail on May 13, 2019. (Doc. no. 106, pp. 5, 8-11.) Defendants state they did not previously receive the interrogatories but will respond by August 7, 2019,

10

which is thirty days from the date they were docketed as part of Plaintiff's reply. (Doc. no. 107, p. 3.) Furthermore, Defendant argues Plaintiff's motion to compel as to the interrogatories should be denied because Plaintiff failed to engage in the required good faith effort to resolve the discovery dispute. (Id.)

Plaintiff did not mention the May 13th interrogatories prior to his June 20th response. (See doc. nos. 95, 96, 105.) Plaintiff does not indicate he contacted defense counsel to try to work out the problem prior to including it in his reply. Thus, belatedly including the interrogatories in his motion to compel runs afoul of Local Rule 26.5, about which the Court previously informed Plaintiff:

> If Plaintiff wishes to file a motion to compel pursuant to Fed. R. Civ. P. 37, he should first contact the attorney for the defendants and try to work out the problem; if Plaintiff proceeds with the motion to compel, he should file a statement certifying that he has contacted opposing counsel in a good faith effort to resolve any dispute about discovery. Loc. R. 26.5.

(Doc. no. 13, p. 10.)

The duty-to-confer prerequisite is not an empty formality. Merritt v. Marlin Outdoor Advert. Ltd., CV 410-053, 2010 WL 3667022, at *4 (S.D. Ga. Sept. 15, 2010). Failure to include such good faith certification, or to make the requisite good faith effort, amounts to a failure to comply with Federal Rule 37(a)(1) and Local Rule 26.5 and warrants denial of the discovery motion. See Holloman v. Mail-Well Corp., 443 F.3d 832, 844 (11th Cir. 2006) (affirming denial of discovery motion based on "a failure to work with the defendants in good faith" during discovery process); Haynes v. JPMorgan Chase Bank, N.A., 466 F. App'x 763, 765-66 (11th Cir. 2012) (affirming denial of motion to compel where movant failed to consult in good faith with opponent before filing motion); see also Layfield v. Bill Heard

Chevrolet Co., 607 F.2d 1097, 1099 (5th Cir. 1979)[2] (holding that failure to comply with the Local Rules may result in summary denial of a motion).

Because Defendants indicate they will respond to Plaintiff's interrogatories in a timely manner, the Court **DENIES AS MOOT** his motion to compel as to the interrogatories. Should any dispute remain after Plaintiff considers Defendants' forthcoming responses to interrogatories, Plaintiff should first contact defense counsel to attempt to resolve the dispute before filing a motion with the Court. He must then attach to any subsequent motion to compel a certification that he made a good faith effort to resolve the dispute with opposing counsel before filing his motion, quote verbatim each request for production at issue, and include the specific ground for the motion and reasons assigned as supporting the motion. See Loc. R. 26.5.

**III. CONCLUSION**

For the reason set forth above, the Court **DENIES** Plaintiff's motion to compel discovery. (Doc. no. 95.)

SO ORDERED this 22nd day of July, 2019, at Augusta, Georgia.

_____
BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

[2]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions that were handed down prior to the close of business on September 30, 1981.