```
        IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF GEORGIA
                    DUBLIN DIVISION


ANTONIO LAMAR DUNHAM,            *
                                 *
     Plaintiff,                  *
                                 *
     v.                          *     CV   318-018
                                 *
TREVON GILBERT, Correctional     *
Officer; SCOTT WILKES, Warden;   *
DR. MARY ALSTON; and DR. EDMOND  *
RITTER,                          *
                                 *
     Defendants.                 *
```

_____

**O R D E R**

_____

Presently before the Court is Defendants' motion for summary judgment as to Plaintiff Antonio Lamar Dunham's remaining claims arising out of an altercation with his cellmate at the Dodge State Prison on May 10, 2016. Plaintiff filed this lawsuit pursuant to 42 U.S.C. § 1983 against several Defendants. Surviving the Court's initial screening under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b) and Defendants' motions to dismiss are the following claims: 1) Plaintiff's claim of deliberate indifference to safety against Defendant Trevon Gilbert regarding his alleged conduct during the May 10, 2016 attack; and 2) Plaintiff's claim of deliberate indifference to a serious medical need against Defendants Scott Wilkes, Mary Alston, and Edmond Ritter for allegedly delaying a second ear surgery.

On May 14, 2020, Defendants filed the instant motion for summary judgment.  The Clerk gave Plaintiff notice of the summary judgment motion and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default.  (Doc. No. 134.)  Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied.

Plaintiff, who was released from incarceration in March 2020, filed and was granted two extensions of time to respond to the motion for summary judgment.  By its last Order granting an extension, Plaintiff was directed to file any response by August 28, 2020.  Now, more than two months have elapsed from the due date, and Plaintiff has filed nothing else.  Accordingly, Defendants' motion is deemed unopposed and is ripe for consideration.

## I.  BACKGROUND

Though Plaintiff has not opposed the motion for summary judgment, the Court must consider the merits of the motion and ensure that the motion is supported by evidentiary materials.  United States v. 5800 S.W. 74th Ave., 363 F.3d 1099, 1101-02 (11th Cir. 2004).  To that end, the Court sets forth the salient facts herein.  Further, the Court finds the facts derived from

Defendants' Statement of Undisputed Material Facts ("SOUMF") are supported by the record and uncontroverted.

**A.   May 10, 2016 Incident**

On May 10, 2016, Plaintiff was incarcerated at Dodge State Prison in the A-3 unit.  (SOUMF, Doc. No. 133-1, ¶ 1.)  At that time, Defendant Trevon Gilbert, a correctional officer, was assigned to the A-3 and A-4 units.  (Id. ¶ 2.)  Around 4:30 a.m., Officer Gilbert left the control booth situated between the A-3 and A-4 units to pass out trays of food to inmates in the A-4 unit.  (Id. ¶ 3.)

According to Plaintiff, his cellmate, Rashad Smith, bit him on his hand and his forehead that morning.  (Pl.'s Dep., Doc. No. 133-9, at 28.)  After this initial attack, Plaintiff claims that he went to the control booth to find no officers present.  So, he began beating on the windows of the control booth.  (Id. at 29.)  Plaintiff claims that Officer Gilbert and another officer were in the A-4 unit serving breakfast,[1] and after several minutes, came

---

[1] In Plaintiff's grievance following the incident, he names Officers Tarver and Foster.  (Pl.'s Dep. at 64; see Defs.' Mot. for Summ. J., Doc. No. 133, Ex. E at 22.)  In his complaint, Plaintiff names Officer Trevor and Officer Gilbert because those are the names given to him by staff members.  (See Pl.'s Dep. at 43-44; Compl., Doc. No. 1, at 7.)  At deposition, Plaintiff explained that one officer was Defendant Trevon Gilbert and the other is still unknown. (Pl.'s Dep. at 51.)  In viewing the facts in the light most favorable to Plaintiff, the Court will assume that Officer Trevon Gilbert, a defendant herein, was present at the scene serving breakfast to inmates in the A-4 unit when Plaintiff was attacked.

into view through the control booth window.  Plaintiff claims the officers looked at him, whereupon Plaintiff allegedly showed him his hand and pointed to his head, both of which were bleeding. (Id. at 29, 35-41.)  Of note, Plaintiff did not tell the officers he was attacked or that he thought he may be attacked again. (Id. at 50-51; see also id. at 47 (Q: "What did you say to them?" A: "Look, look.").)  In fact, Plaintiff testified that at the time, he did not believe his cellmate posed any further risk of harm to him.  (Id. at 53 ("I thought he was going to leave me alone.  I thought he wasn't going to attack me no more . . . .").)  Plaintiff claims that the officers turned around and resumed serving breakfast.  (Id. at 34, 49.)

Plaintiff then returned to his cell to put on his leg brace and pants because he saw his cellmate leave the room.  (Id. at 30.)  However, the cellmate returned and promptly bit off his right ear.  (Id.)  Plaintiff returned to the control booth and beat on the window.  (Id.)  This time, the officers responded quickly, and Plaintiff was taken to the medical department.  (Id. at 30-31, 36.)

For his part, Officer Gilbert averred that he only saw Plaintiff once, after his ear had been bitten off. (Decl. of Trevon Gilbert, Doc. No. 138, ¶ 8.)  Officer Gilbert stated that he heard banging on the door from the A-3 unit while he was distributing

meals in the A-4 unit. When he approached the door, he saw Plaintiff and noticed blood coming from his ear. (Id. ¶ 6.) Plaintiff told Officer Gilbert that he had been involved in an altercation with his cellmate. Officer Gilbert advised Lieutenant Foster, the officer in charge. (Id.) Plaintiff was taken to the medical department of the prison. (Id. ¶ 7.)

Following the incident, at approximately 8:00 a.m. on May 10, 2016, Plaintiff provided a witness statement in which he only mentioned one attempt to contact the officers in the control booth, after his ear had been bitten off. (Id. ¶ 8 (citing Defs.' Mot. for Summ. J., Ex. E at 8-9).) Similarly, on May 12, 2016, in response to a disciplinary report concerning the altercation, Plaintiff did not mention any attempt to contact the officers in the control booth. (Id. ¶ 9 (citing Defs.' Mot. for Summ. J., Ex. E at 14-19).) On May 16, 2016, however, Plaintiff filed a grievance in which he claims that an officer ignored his plea for help and, as a result, his cellmate had the opportunity to bite his ear off. (Defs.' Mot. for Summ. J., Ex. E at 22.)

**B. Plaintiff's Second Ear Surgery**

After his initial treatment in the prison's medical department, Plaintiff was taken to Dodge County Hospital. (SOUMF ¶ 6.) Next, Plaintiff was seen by a plastic surgeon, Dr. Syribeys in Macon, Georgia. (Id. ¶ 7.) Dr. Syribeys determined that

5

Plaintiff's ear could not be reattached and performed an initial surgery at the amputation site. (Id.)

Plaintiff was referred to Defendant Edmond Ritter, a plastic surgeon employed by Augusta University Medical Center in Augusta, Georgia. (Id. ¶ 23.) Dr. Ritter first saw Plaintiff on September 7, 2016, at which time he determined that the most appropriate course of treatment for Plaintiff was an external reconstruction of his ear. (Id. ¶ 24.) The external reconstruction process would require more than a single surgery. (Id. ¶ 25.) This ear reconstruction was an elective surgery; it was not a medically necessary surgery. (Id. ¶ 26 (citing Decl. of Edmond Ritter, M.D., Doc. No. 133-6, ¶ 5).) According to Dr. Ritter, the surgery was designed to restore the external appearance of his ear, not to impact his inner ear. (Ritter Decl. ¶ 5.) The surgery was not intended to affect Plaintiff's complaints of dizziness, balance, headaches, or other pain. (Id.) Those complaints would be more properly evaluated and treated by another specialist such as an ENT or neurologist. (Id.)

With respect to the ear reconstruction process, Dr. Ritter further explained that he had to allow time for the area to heal and the inflammation to reduce. (SOUMF ¶ 27.) Performing the reconstructive surgery less than six months following the amputation would not meet the standard of care; typically, such

surgery is performed at least a year following amputation. (Id. ¶¶ 27-28.)  Moreover, Dr. Ritter's staff, not Dr. Ritter personally, scheduled his surgeries, and with respect to inmates, the staff had to consider additional factors such as security, staffing, and transportation. (Id. ¶ 29.)  Ultimately, Dr. Ritter performed the first step of Plaintiff's ear reconstruction surgery on October 31, 2017, almost 18 months after the amputation. (Id. ¶ 30.)

In the interim, Plaintiff was housed at Augusta State Medical Prison ("ASMP") on four occasions: (1) from November 29 to December 6, 2016; (2) from December 22 to 29, 2016; (3) from May 16 to 22, 2017; and (4) from October 26 to November 14, 2017. (Id. ¶ 13.) On these dates, Plaintiff's assignment to ASMP was listed as "transient" because he was only there for a short period surrounding specific medical procedures or services. (Id.) Plaintiff was also transported to ASMP at various times on a daily basis for medical evaluations. (Id.)  Plaintiff was never permanently assigned to ASMP during the relevant time period. (Id.)

As the Warden of ASMP, Defendant Scott Wilkes did not provide medical treatment to any inmate, nor did he schedule off-site medical appointments. (Id. ¶ 14.)  Instead, evaluation of the need for medical treatment, prescribing courses of medical

7

treatment, and scheduling and approving of medical procedures were handled by the medical staff of ASMP or the inmate's assigned primary facility.  (Id.)  Accordingly, in reviewing Plaintiff's grievances about his medical care and course of treatment, Warden Wilkes did not have the authority or expertise to overrule or assert his judgment; rather, Defendant Mary Alston, a physician at ASMP, responded to Plaintiff's concerns regarding his medical care at ASMP.  (Id. ¶¶ 15-17.)  That said, Dr. Alston was not Plaintiff's primary care provider, was not personally involved in Plaintiff's medical care, and did not evaluate or render treatment to him regarding his ear injury.  (Id. ¶ 17.)  Dr. Alston averred that because they are in the best position to monitor an inmate's treatment on a regular basis, make adjustments to the plan, and seek consultations with specialists or outside providers, it is more appropriate for treating physicians at an inmate's assigned primary institution to evaluate complaints and provide a course of treatment.  (Id. ¶ 18.)  In keeping with this premise, Dr. Alston responded to Plaintiff's November 16, 2016 grievance about tinnitus and other complaints related to his ear by advising him to discuss these issues with his treating provider at his assigned primary institution.  (Id.)  In fact, Plaintiff's medical records reflect that he sought and received medical treatment for his right ear complaints at his assigned primary institution following Dr.

Alston's response.  (Id. ¶ 19.)  Also, following Plaintiff's May 30, 2017 grievance about not undergoing a second ear surgery, Dr. Alston noted that Plaintiff's medical record reflected that another appointment for him had been made with the surgeon.  (Id. ¶ 20.)

While Plaintiff had been scheduled for the second ear surgery on several occasions over the relevant time period, the surgery was rescheduled for various reasons such as lack of transportation from the prison, administrative errors by Dr. Ritter's office, and more urgent cases taking precedence.[2]  (Id. ¶ 30.)  According to both Drs. Alston and Ritter, the delays and rescheduling of Plaintiff's second ear surgery did not pose a risk of harm to him. (Ritter Decl. ¶ 10; Decl. of Mary Alston, M.D., Doc. No. 136, ¶ 13.)  In fact, the delays provided more time for the surgical site to heal, increasing the likelihood of a successful surgery. (Ritter Decl. ¶ 10.)

## II.  SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

---

[2] Plaintiff claims the surgery was scheduled and delayed on November 20, 2016, May 18, 2017, and September 28, 2017. (Compl. at 14.)

purpose of the summary judgment rule is to dispose of unsupported claims or defenses, which, as a matter of law, raise no genuine issues of material fact suitable for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322—24 (1986). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of those material facts "is 'genuine' . . . [only] if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" for a jury to return a verdict for the nonmoving party. Id. at 252; accord Gilliard v. Ga. Dep't of Corrs., 500 F. App'x 860, 863 (11th Cir. 2012) (per curiam). Additionally, the party opposing summary judgment "may not rest upon the mere allegations or denials in its pleadings. Rather, [his] responses . . . must set forth specific facts showing that there is a genuine issue for trial." Walker v. Darby, 911 F.2d 1573, 1576—77 (11th Cir. 1990). As required, this Court will view the record evidence "in the light most favorable to the [nonmovant]," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and will "draw all justifiable inferences in [Plaintiff's] favor." United States v. Four Parcels of Real

10

Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*) (internal quotation marks omitted).

### III.   LEGAL ANALYSIS

Section 1983 creates a private right of action for the deprivation of federal rights by persons acting under color of state law.[3]   42 U.S.C. § 1983.   "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment" to the United States Constitution.   Helling v. McKinney, 509 U.S. 25, 31 (1993).   Here, Plaintiff alleges that he was deprived of his Eighth Amendment right against cruel and unusual punishment when Officer Gilbert ignored his plea for help and when Warden Wilkes and Drs. Alston and Ritter unreasonably delayed his second ear surgery.   The Court will separately address the two claims.

**A.   Deliberate Indifference to Safety**

The Eighth Amendment "imposes a duty on prison officials to take reasonable measures to guarantee the safety of the inmates." Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994)).   Thus, prison officials have a duty to protect prisoners from each other. Farmer, 511 U.S. at 833.   However, not "every injury suffered by

---

[3] Here, there is no dispute that Defendants were at all relevant times acting under color of state law.

11

one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." Id. at 834. Rather, a prison official violates the Eighth Amendment, i.e., is deliberately indifferent, "when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk." Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003) (quoted sources omitted). Thus, to prevail on such a claim brought under § 1983, a plaintiff must show: (1) a substantial risk of serious harm; (2) the defendant's deliberate indifference to that risk; and (3) causation. Brooks v. Warden, 800 F.3d 1295, 1301 (11th Cir. 2015).

At summary judgment, Officer Gilbert contends that Plaintiff has not presented a genuine dispute of material fact with respect to the second prong – deliberate indifference. Whether a defendant was deliberately indifferent to a serious risk has both a subjective and objective component. Marbury v. Warden, 936 F.3d 1227, 1233 (11th Cir. 2019). The subjective component demands that the prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." Farmer, 511 U.S.C. at 837.

In the Farmer case, the United States Supreme Court identified three ways that a prison official might avoid Eighth Amendment liability:  to show that (1) he "did not know of the underlying facts indicating a sufficiently substantial danger and that [he was] therefore unaware of a danger"; (2) he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent"; or (3) he "responded reasonably to the risk, even if the harm ultimately was not averted."  Id. at 844.

In this case, viewing evidence in the light most favorable to Plaintiff, Officer Gilbert was made aware that something was wrong when he noticed Plaintiff banging on the control booth window with a bloody hand and forehead as he was delivering meals to the inmates in the next unit.  Assuming, as the Court must, that Plaintiff's injuries were visible to Officer Gilbert, this alone is insufficient to establish that Officer Gilbert became aware at that point that Plaintiff was at risk of serious harm.  First, to the extent Plaintiff had an initial injury, it was minor.  Immediately following the incident, the registered nurse of Dodge State Prison reports that Plaintiff had an abrasion with broken skin on his right hand and injury to his left ear.  No other injuries were noted.  (SOUMF ¶ 12.)  Second, Plaintiff did not inform Officer Gilbert that he had been attacked; rather, he just

13

yelled, "look, look" through the glass. Plaintiff did not ask for help or seek protection. Third, even Plaintiff was not aware of the risk of serious harm as he returned to his cell. He testified that he did not believe his cellmate was going to attack him again. Under the circumstances, where the only knowledge Officer Gilbert had of the situation was from Plaintiff himself, it is incongruous to claim that Officer Gilbert should have been subjectively aware of a serious risk of harm of which Plaintiff himself was unaware. Thus, Plaintiff has failed to demonstrate a genuine dispute of material fact as to the subjective prong of his deliberate indifference claim.

Further, Plaintiff has not established the objective prong. More particularly, he has not established that Officer Gilbert's failure to immediately respond to an inmate with a minor injury was objectively unreasonable. At most, Officer Gilbert's decision to continue feeding the other inmates was negligent or grossly negligent, which is not sufficient to show that Officer Gilbert violated Plaintiff's Eighth Amendment rights. Patel v. Lanier Cnty. Ga., 969 F.3d 1173, 1188 n.10 (11th Cir. 2020) (stating that conduct that cannot be fairly characterized as "reckless," i.e., more than negligent, will not meet the Supreme Court's standard for deliberate indifference). Thus, Plaintiff has failed to

14

demonstrate a genuine dispute of material fact as to the objective prong of his deliberate indifference claim.

Upon the foregoing, Officer Gilbert is entitled to summary judgment on Plaintiff's claim of deliberate indifference to his safety.

**B.   Deliberate Indifference to Medical Needs**

A prisoner's claim of inadequate medical care does not violate the Eighth Amendment unless the treatment rises to the level of "deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 104-05 (1976).  Here, Plaintiff claims that Warden Wilkes and Drs. Alston and Ritter delayed his second ear surgery so as to constitute deliberate indifference to his serious medical condition.

To prevail on a deliberate indifference claim, a plaintiff must show: "(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury."  See, e.g., Mann v. Taser Int'l, 588 F.3d 1291, 1306-07 (11th Cir. 2009) (cited source omitted).

With respect to the first prong, the objective component, a "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a

15

doctor's attention." Id. at 1307 (quoted source omitted). Here, it is undisputed that Plaintiff's ear had already been treated and amputated by Dr. Syribes, which certainly qualified as a serious condition. At the time Dr. Ritter treated Plaintiff, however, his ear did not pose a serious medical need. The proposed second surgery, which was an external ear reconstruction, was an elective surgery – not medically necessary. (Ritter Decl. ¶ 5.) And while Plaintiff complained about dizziness, balance, headaches, and other pain, the second ear surgery was not intended to address those issues. (Id.) Moreover, there is no evidence that the delay in performing the second ear surgery worsened Plaintiff's condition. In fact, Dr. Ritter testified that a delay of at least a year is appropriate before attempting an external ear reconstruction to allow the wound area to heal. (Id. ¶ 6.) In short, based on the evidence of record, no reasonable jury could find that the second ear surgery was a serious medical need.

In order to satisfy the second prong, the subjective component, a plaintiff must show that the prison official subjectively knew of the risk of serious harm to the plaintiff and disregarded that risk with conduct that goes beyond negligence. See, e.g., Dang v. Sheriff, Seminole Cnty. Fla., 871 F.3d 1272, 1280 (11th Cir. 2017); Melton v. Abston, 841 F.3d 1207, 1223 (11th Cir. 2016); see also Patel, 969 F.3d at 1188 n.10 (conduct must be

"reckless," i.e., more than negligent, to meet the Supreme Court's standard for deliberate indifference).  In this case, even assuming the second ear surgery was medically necessary, Plaintiff cannot establish that Drs. Alston and Ritter and Warden Wilkes acted recklessly in delaying the surgery.  Notably, Dr. Alston and Warden Wilkes were not directly involved in Plaintiff's medical care; thus, they would not have been subjectively aware of any need for the surgery.  Moreover, though Dr. Ritter's office delayed the surgery a few times, there is no evidence that the delays were done without regard to the harm it could cause Plaintiff.  In fact, the delays were due to a variety of legitimately reasonable factors.  Thus, Plaintiff has not shown that any Defendant acted with deliberate indifference to his "need" for a second ear surgery.

Finally, Plaintiff cannot satisfy the third prong - causation.  Plaintiff has presented no evidence to establish that the delay in receiving the second ear surgery caused him further harm.  In fact, Dr. Ritter has opined that the delay did not pose a risk of harm to Plaintiff; rather, it provided more time for the surgical site to heal.[4]  (Ritter Decl. ¶ 10.)

---

[4] Dr. Ritter further stated that the surgery he performed on October 31, 2017 was successful, but Plaintiff has refused to participate in the necessary subsequent surgeries.  Thus, any deficiencies with the reconstruction are due to Plaintiff's non-participation and non-compliance.  (Ritter Decl. ¶ 11.)

In sum, the Court concludes that Plaintiff cannot demonstrate a case of deliberate indifference to a serious medical need as a matter of law, and Defendants Wilkes, Alston, and Ritter are therefore entitled to summary judgment.

### IV.  CONCLUSION

Upon the foregoing, Defendants' motion for summary judgment (doc. no. 133) is **GRANTED**.  The Clerk shall **CLOSE** the case and **ENTER JUDGMENT** in favor of Defendants.

**ORDER ENTERED** at Augusta, Georgia, this 24th day of November, 2020.

_____
UNITED STATES DISTRICT JUDGE